## LIABILITY OF CARRIER FOR APPLES DAMAGED IN TRANSIT.

Superior Court of Cincinnati.

I. N. PRICE & COMPANY v. THE ERIE RAILROAD COMPANY.

Decided, July, 1912.

*Carriers—Action. on a Bill of Lading—Custom or Usage Will Not be Considered, When—Liability for Apples Rendered Unsalable in Transit.*

1. Where, in the absence of explanation, the bruising, mixing and freezing of a car load of assorted apples resulting in their practical destruction appears to have been due to the fact that the closed box car in which they were shipped became disabled in transit, and to their transfer into an open and unsuitable box car, the railway company is liable for the total loss occasioned thereby.
2. In an action on a bill of lading, a court will not consider a usage or regulation affecting the mode or place of delivery, with reference to which it is claimed the shipper contracted, where such usage or regulation is unreasonable in its operation and contrary to public policy.

*G. F. Osler* and *Nelson & Hickenlooper*, for plaintiff.
*C. Bentley Matthews* and *Harry T. Klein*, contra.

HOFFHEIMER, J.

This is an action on a bill of lading to recover the value of a carload of apples consigned by plaintiff's agent at Lockport, New York, to plaintiff at Cincinnati. The cause was tried to the court and a jury, at the April term, 1912 (April 30), and at the conclusion of all the evidence, both sides having moved for an instructed verdict, the same is for the determination of the court on the evidence and the law.

The apples involved in the shipment were clean hand-picked stock, and the four varieties (Baldwin, Northern Spy, Greening and King) had been carefully binned. Shipment was made November 7, 1903, and in a tight box car of the New York, Lake Erie & Western Railroad, being car No. 27,952. Delivery of

the carload of apples was attempted at Cincinnati November 23, 1903. The apples tendered plaintiff were not in the tight box car of the New York, Lake Erie & Western Railroad, No. 27,592, but were in an entirely different lading—an open stock car of the Pere Marquette Railroad, being car No. 28,034. The apples thus tendered were not binned, the varieties were no longer separated, but said apples were indiscriminately piled up in the car, and they were badly bruised, chopped up, mixed with dirt and cinders, and frozen.

Plaintiff, immediately upon inspection of the merchandise thus tendered refused to accept same. Defendant afterwards, so it is alleged in the answer, sold same, crediting itself with the expenses of transportation and holding some small balance in its hands for the benefit of plaintiff.

Aside from plaintiff's mere statement, during the course of the trial, that the apples he saw "might have made a car of cider apples," there was a complete failure to prove that the apples as tendered were of any real or substantial value. On the contrary, the fair inference to be drawn from all the evidence is that, as a shipment of graded apples, same was practically worthless to consignee.

Under the particular circumstances of this case, considering the change of lading that was made without any knowledge on plaintiff's part, involving some doubt, possibly, as to identification of the merchandise tendered, and considering, also, the confusion of the grades, as well as the apparently worthless condition of the fruit, I am of opinion that the rule which ordinarily requires the consignee to accept the merchandise consigned and afterwards make claim for any damages suffered, should not, in justice, be applied here, and that the case should be considered, under these circumstances, as one of total loss. *Thomas & Company* v. *Wabash Railway Company*, 62 Wis., 642; *G. R. & I. Railroad Co.* v. *Warren*, 16 Ill., 502.

It appears, from the evidence, that the car in which the apples were originally shipped became disabled *en route*, and that the change of lading without plaintiff's knowledge took place at Dayton, Ohio, November 13, 1903. At that point defendant trans-

ferred these apples from the original *tight box car* in which they had been binned, into an open stock car, piling the apples indiscriminately in the car and without regard to grades. According to Mr. Devereaux, of the United States Weather Bureau (called by defendant as an expert), these apples began to freeze on the 17th, 18th and 19th of November, on which dates the minimum temperature was 23 degrees, 18 degrees and 18 degrees, respectively. Mr. Devereaux testified further, that the apples would have commenced freezing, in an open stock car, at 25 degrees. And further, that, had said apples remained in the tight box car, instead of being placed in an open stock car, they would not have frozen, whether delivered at Ivorydale on the 15th (the date upon which defendant claimed same reached Ivorydale), or on some subsequent date and prior to the 20th or 21st (the date on which plaintiff was notified as to the whereabouts of the car) because, according to this same expert, they would have been safe in a box car until a minimum temperature of 15 degrees was reached; and there was no such temperature within the days mentioned.

The presumption that defendant was negligent in causing or permitting the original box car to become disabled *en route,* and likewise in transferring these apples into a car which, considering the perishable nature of the merchandise and the circumstances, was wholly unsuitable, has not been rebutted. Indeed defendant has offered no evidence on these matters whatsoever. The negligence of defendant in respect of said matters directly contributed to the condition of the merchandise and to the freezing which, although in itself an act of God, under the evidence could have been prevented by due care in respect of the matters referred to. Defendant having received the apples in good condition, has wholly failed to sustain the burden that devolved on it, namely: of showing that the loss or destruction of the apples was not due to its negligence, or that such loss was due to some cause for which it was not responsible. *Moore on Carriers,* pages 396, 389, 387, 391, 220 to 224; *3 Hutchinson on Carriers,* Section 1354; *Graham* v. *Davies,* 4 O. S., 362; *Union Express Co.* v. *Graham,* 26 O. S., 595; *United States Express Co.* v. *Bach-*

*man,* 28 O. S., 144; *Gaines* v. *Transportation Co.,* 28 O. S., 418; *P., C., C. & St. L. Railway Co.* v. *Mitchell,* 175 Ind., 135, Syllabus 10.

As to necessity for furnishing a suitable car for transportation, see *Foresler* v. *Southern Railway Co.,* 147 N. C., 553; 15 *American & English Annotated Cases,* 143.

In said case it was held:

"It is the duty of a carrier to furnish cars suitable for the shipment of the particular commodity undertaken to be conveyed, and if injury results to such commodity from the unsuitableness of the cars for the shipment thereof, the carrier is liable.

"Where it appears that a ventilated car is the only safe means of transporting dried apples, a carrier which, having undertaken to transport said apples, carries them in an ordinary box car, is liable for the damages resulting from the unsuitableness of such car for such shipment."

And in *Beard* v. *Ill. Central Railway Co.,* 79 Iowa, 518 (7 L. R. A., 280), the court say:

"The nature of the goods must be considered in determining the carrier's duty. Some metals may be transported in open cars. Many articles of commerce when transported must be protected from rain, sunshine and heat and must have cars fitted for their safe transportation. * * * Fruit and some other perishable articles must be carried with expedition and protection from frost. So the carrier must attend to the character of the goods he transports."

And see, also, *Fookins* v. *Express Company,* 99 Minn., 404; *Brennison* v. *Penn. Railroad Co.,* 100 Minn., 102.

The proximate cause of the cutting up of these apples, of their becoming mixed with dirt and cinders, of their frozen condition, that is to say, of their practical destruction, was defendant's unexplained negligence in the matter of the damaged car and the transfer of the apples into an unsuitable open stock car. It is, therefore, liable to plaintiff for the value of this shipment, unless its second defense is available.

The first defense, after admitting the receipt of the apples and the bill of lading, was, in effect, a general denial, but the second defense sets up an alleged rule or usage governing the use by plaintiff and other provision brokers, of track space in defendant's Cincinnati yards for the selling by them of goods in bulk and directly from their cars; and it is contended that, by reason of plaintiff's alloted space in the Cincinnati yard being full at the time the car arrived at Ivorydale (as defendant claims on the 15th), the damage was occasioned while defendant was holding said car at Ivorydale for plaintiff, and, hence, while it was acting as warehouseman only, and, in the absence of affirmative proof by plaintiff that defendant was negligent as warehouseman, defendant claims that plaintiff can not recover.

In view of the evidence of plaintiff that it was making all efforts to locate its already delayed shipment, and that it could not find or locate same until the agent of defendant, Mr. Williams (who in turn was making efforts to trace it), notified plaintiff, on the 20th or 21st, that it was at Ivorydale (he having at said date received such information from Jersey City), it is difficult to understand upon what theory defendant expected plaintiff to know that the car containing plaintiff's merchandise was at Ivorydale on the 15th (if it actually was there on said date), when its own officers (as evidenced, by the acts of Williams in making trace) seemed to have been unable to locate the merchandise.

The difficulty—and it is likely enough that there was difficulty—in locating the car (if the car was actually at Ivorydale on the 15th) was, in all probability, due to the change of lading. But if the car containing plaintiff's merchandise was at Ivorydale on the 15th, and if the shipment was in good condition at that time, if the usage pleaded was valid and binding and of a character to terminate its liability as carrier, surely it could not be available for such purposes as of the date mentioned, because, without any notice to plaintiff of the arrival of said car on said date, there could not have been constructive delivery at such time, and plaintiff, as already stated, had no knowledge as to the whereabouts of the car, and reasonably could not have had, in

the absence of knowledge of the change of the lading, until the 20th or 21st (when it was so notified by defendant's agent Williams) ; and prior to said date the damage actually occurred.

If, however, the court is in error in any of these deductions, and notwithstanding agent Williams' efforts to trace the car after the 15th, said car was at Ivorydale on the 15th, as defendant claims, the question would still be: Did defendant's liability as carrier cease and that of warehouseman begin on said date? The determination of this question involves the validity or legality of defendant's second defense.

It is admitted by plaintiff that, together with the other provision brokers, it used the track space of defendant in Cincinnati for selling produce in bulk from its cars; and it appears that the rule had been promulgated by the railroad company, about three years prior to the loss of the car involved herein, governing such use of defendant's track space in the Cincinnati yards and the holding of dealers' cars at Ivorydale. This rule, with its limitations, it is to be noted, is not one that can be said to have been, in its entirety, the result of the course of business of the brokers, but, as framed, it was an arbitrary rule devised, established and enforced by Mr. Barnard, the joint agent of the C., H. & D. and Erie railroads. Moreover, there was no peaceful acquiescence in said rule by this plaintiff. Mr. Barnard frankly admitted that plaintiff, as well as Mr. Bender of Bender, Streibig & Company, Mr. Markley, and others, repeatedly protested against the rule. Indeed, Mr. McLeod, official over Barnard, on plaintiff's protest, as I recall the evidence, promised to take the matter up but, notwithstanding said promise, the rule continued in operation, and was in operation at the time complained of and up to the time Mr. Skinner succeeded Mr. Barnard, when this alleged usage, or custom, or regulation, was abrogated by the railroad company itself.

The evidence shows, further, that after the promulgation of this rule or regulation by the railroad, a number of dealers in produce or provision brokers (competitors of plaintiff) formed combinations or groups, referred to in the evidence as the "Irish Push" or the "Jewish Push," for the purpose of pooling their

individual allotments (which had been figured by Mr. Barnard on the business done by the individual dealer during the preceding year), and that the aggregate allotment, as thus pooled was under the control of some person in the joint employ of the group or combination.   The evidence shows, also, that each group or combination so formed and so operated was actually recognized as a group or combination by the railroad, irrespective of the individual allotment of the members thereof.   The result of such recognition by defendant railroad of said groups or combinations, as must be obvious, gave to the individual members of such groups or combinations first choice in bringing in cars to any vacancy in the aggregate allotment of such groups, notwithstanding the individual's allotment was already full, to the exclusion of the independent provision broker or dealer, such as was this plaintiff, or Bender, or Markley, or others.

In view of these apparent results in its operation, such a regulation can not be held to have been a reasonable one, and inasmuch as it placed it in the power of the combinations, through their members, to keep cars loaded with produce and belonging to independent dealers out of the local market and hence out of the possibility of competition, it was clearly contrary to public policy.   The rule was unlawful as establishing an unreasonable preference or advantage, by virtue, also, of Section 3 in the federal act to regulate commerce (24 U. S. Statutes at Large, page 379):

"It shall be unlawful for any common carrier, subject to the provisions of this act, to make or give any undue or unreasonable preference or advantage to any particular person, company, firm or corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

In *Rogers Company* v. *Penn. Railroad*, 12 I. C. R. R., 309, speaking of discrimination against shippers, in the use of a congested yard for receipt of shipments, it was said, by Lane, Commissioner:

"That the embargo (against complainant and others owing to congestion in the yard, still allowing others to receive shipments there) constituted an unlawful discrimination against complainant by defendants, is apparent and indisputable. Whatever may be said of an embargo against one commodity only in a time of congestion, nothing can be said for an embargo which refuses transportation facilities to some establishment, while affording such facilities to their competitors. If the exercise of such a power were to be at all tolerated, carriers would be able to issue sentence of commercial death against some of their patrons, while continuing to serve others."

And again:

"There is no distinction in principle between a discrimination in furnishing of facilities with which to originate a shipment and such a discrimination as is here shown, in the furnishing of facilities with which to receive a shipment."

To sustain the validity and legality of the alleged usage or the reasonableness of the regulation, defendant cites the court to several cases: *Laughlin Bros.* v. *Philadelphia, etc., Railroad,* 74 Atlantic Report, 418; *Carr* v. *Delaware Railroad Co.,* 75 Atlantic Report, 928; *Chicago, etc., Railroad* v. *Ryman,* 75 Northeastern Rep., 587.

Attention to these cases will show that in none of them was discrimination practiced or allowed affecting the place of delivery, but, on the contrary, there would seem to have been absolute equality among shippers.

*Laughlin Bros.* v. *Philadelphia, etc., Railroad Company,* which is earnestly relied on by defendant *"as being on all fours"* with the case at bar, on the contrary illustrates the precise point made by Lane, Commissioner (*supra*). The court say, at page 418:

"The trial judge held, that the evidence showed the custom in the trade, above noted, to deliver to consignees only, at the delivery yard, Second and Masters street, but, on account of the limited space in that yard, its use as a market place, *to deliver not more than three cars at a time to any one person or firm, and to deliver additional cars only as those first delivered were empty and released.*"

The case cited by defendant, therefore, as sustaining its second defense are all to be distinguished from a case such as the one under consideration, where inequality appears.

Conceding that, in an action on a bill of lading a usage rule or regulation may be shown, *affecting the mode or place of delivery*, and with reference to which the shipper must be supposed to have contracted, same will not be considered by the court where, as here, it appears to have been not only unreasonable in its operation, but contrary to public policy. Being unlawful, this alleged usage, or rule, as set out in the second defense, can be no defense. *Continental Wall Paper Co.* v. *Voight*, 212 U. S., 223, 262.

For the reasons given, this plaintiff is entitled to judgment for the full amount of its claim, namely, $406.54, with interest at six per cent. from November 7, 1903.

Judgment accordingly.